[No. 18795.  Department One.  December 19, 1924.]

## WESTERN COOPERAGE COMPANY, *Appellant*, v. AUGUST COLUSSI, *Respondent*.[1]

SALES (155)—BREACH OF CONTRACT—DAMAGES—MITIGATION. Upon breach of a contract to furnish gear for salmon fishing, whereby plaintiff lost the prospective profits from the season's pack, it was his duty to minimize his damages by purchasing fish on the open market, where it appears that he could have done so.

SAME (154)—BREACH OF CONTRACT—MEASURE OF DAMAGES—EXCESSIVE VERDICT—EVIDENCE—SUFFICIENCY. The reduction of an excessive verdict for prospective profits from the season's salmon pack does not cure the error, where, from the testimony, it appears that there were other elements entering into the actual loss sustained, requiring a further reduction and therefore necessitating a new trial.

Appeal from a judgment of the superior court for King county, Joiner, J., entered March 25, 1924, upon the verdict of a jury rendered in favor of the defendant, in an action on contract.  Reversed.

*Reynolds, Ballinger & Hutson,* for appellant.
*Jordan & Jordan,* for respondent.

TOLMAN, J.—This action was instituted by appellant, as plaintiff, to recover upon a trade acceptance in the sum of $214.50, the making, delivery, and non-payment of which is admitted.  The entire controversy centers upon the counterclaim of the respondent as defendant.  Therein it is alleged that the respondent was engaged in mild curing King salmon on the Copper River Flats near Cordova, Alaska, and that, having contracted to purchase his supplies from the appellant, he, on April 17, 1923, ordered thirty tierces from the appellant to be used for his season's pack, directing that they be shipped to him at Cordova by the first

[1]Reported in 231 Pac. 1.

vessel sailing from Seattle after April 25, which vessel, it is conceded, was the boat "Victoria," which sailed on April 28 and arrived at Cordova about May 4 or 5. Respondent pleads and testifies with some precision and detail that, at the time of so ordering the tierces, he made known to appellant the purpose for which they were ordered, and advised appellant that, if the shipment did not go forward at the time designated, it would arrive too late for his purpose and he would entirely lose his season's fishing. All this is denied by appellant, which asserts that the order was to ship the tierces on the "Alameda," sailing from Seattle on May 5, and that they were so shipped.

Respondent left Seattle about April 18 for Cordova, having employed some fishermen in Seattle to go north with him, and having arranged for others in Alaska. It is conceded that the fishermen were to supply their own boats and to catch the fish, while respondent was to furnish them the necessary gear and to pay them one dollar each for King salmon, without reference to size or weight, delivered to him on the ground. The tierces were not shipped on the "Victoria," sailing on April 28, but were shipped on the "Alameda," sailing May 5, and arrived at Cordova about May 12 or 13. Respondent claims that the tierces not arriving on the "Victoria" on May 4, and he having no information as to when they would arrive, if at all, these facts were then communicated to his fishermen, who immediately upon the arrival of the "Victoria" came in from several locations which they had staked, seeking from him the necessary gear; that, when they were informed that he had no tierces and therefore could receive and care for no fish, and had no information as to when if ever he would be supplied with tierces, his laborers quit him and sought other employment; that no other laborers were to be had at Cordova at that

time; that the salmon run was about to begin and it
was impossible to obtain fishermen from any source in
time to avail himself of the salmon run, and therefore
he was prevented from making his season's catch,
causing him a loss of $6,000 of anticipated profits, and
of $400 on account of expenses in preparing his gear,
payment of freight, etc., and he prayed for a judgment
of $6,400, less the amount of the trade acceptance of
$214.50.

The jury returned a verdict in favor of respondent
for $4,000. Upon the hearing of the motion for a new
trial, the court having announced that he would grant
the motion unless the respondent consented to a re-
duction of the amount of his recovery from $4,000 to
$3,133.02, and a written acceptance of such reduction
having been filed, the motion for a new trial was de-
nied and judgment was entered for that amount, with
costs, from which judgment the plaintiff has appealed.

The facts were very sharply contested, and in such
conflict that the jury might well have found against
the respondent upon a number of points, which evi-
dently they found in his favor. We will discuss none
of these points, save one.

Respondent, in his testimony, followed the general
allegations of his cross-complaint and gave his version
of what occurred at Cordova following the non-arrival
of the tierces on May 4; sufficiently so to carry to the
jury the question of whether he lost the services of
the fishermen he had theretofore employed solely by
reason of the non-arrival of the tierces, and the ques-
tion of whether other labor could then or thereafter
have been employed so as to enable respondent to make
his season's catch. But nowhere in the evidence of-
fered by respondent do we find anything showing, or
tending to show, that the salmon actually began to run

in commercial quantities before the tierces actually did arrive, or that thereafter he could not have purchased suitable salmon on the open market to have filled his tierces and completed his season's pack.

On the part of appellant there was produced a witness who was the manager of a cannery at Cordova, was actually on the Copper river in 1923, operating a cannery, and who showed complete familiarity with the whole situation there. He was asked:

"Q. Were there fish for sale on the open market up there? A. Yes, sir; there are a number of independent fishermen, as we call them, who have their own boats and own gear, and sell to whoever pays the biggest price. Q. And they would sell their fish for $1.35 apiece, King salmon? A. Yes, sir, I understood so. Q. That was the quoted rate? A. Yes, sir."

Upon cross-examination upon this subject, the following occurred:

"Q. These men that sold the fish for $1.35, they usually had their fish sold before they were caught, didn't they? They had their arrangements made to sell the fish before they were actually caught? A. Some of them did, and some didn't. Q. Wasn't it the usual thing for a man when he goes out with his net, or gear, to fish, that he knows who he is going to sell his fish to; and he has his arrangements made? A. The usual practice up there has been to make arrangements with some company for your fish for a certain price, and some other company will come along and raise the price five or ten cents, and they immediately change over to the other company that raises the price. Q. And breaks the contract? A. Very few of them have a written contract, who have not any gear. Q. Just a verbal understanding? A. Yes, sir, just a verbal understanding; there may be some that have a contract, but I doubt it very much. Q. But they usually go out and sell their fish, and know what the price is? A. Yes. Q. And the price depends on whether they furnish their own gear, or whether the employer furnishes the gear?

A. Whether they furnish the gear, or the employer furnishes the gear.''

This meager testimony seems to be all that was offered by either side touching the possibility of the respondent minimizing his damages by purchasing fish in the open market, but it was undisputed and unimpeached and so far shows that fish could have been purchased as to make that fact one to be considered. The rule with reference to respondent's duty to minimize his damages is so elemental and so well settled in this state that no citation of authority upon that point is necessary. It would seem that respondent's cross-complaint should have contained an allegation to the effect that fish for his needs could not have been purchased upon the open market at the time and place in question; however, no demurrer was interposed to the cross-complaint and that question is not here. But in the absence of allegation and proof that fish for his needs could not be so obtained, no verdict in excess of· the amount of actual expenses caused by the delay should have been allowed to stand; or, if fish could have been so obtained his recovery should have been limited to the excess cost over what he would have otherwise paid for fish. The motion for a new trial was broad enough to raise this question, and we cannot think that it is met by the reduction in the amount of the verdict which the trial court directed.

The testimony on behalf of respondent was that he used nets with 9 1-4 inch mesh, which would catch salmon of eighteen pounds weight and upwards, permitting all smaller fish to escape, and that with salmon such as his gear was designed to catch, the pack would be forty fish to the tierce. Of course, if respondent had actually made his pack, his expenses would not figure in the verdict, but only the higher price which he paid for the salmon, and on his proof of forty fish to the

tierce, his loss, if he could have purchased fish on the open market for $1.35 each, would have been on each tierce forty times 35 cents, or $14 per tierce, or a total of $420 for the thirty tierces. There was, however, abundant and satisfactory evidence that King salmon varied in size and weight, and were frequently packed as high as seventy to the tierce, and that the average from that vicinity for the season of 1923 was 65 to the tierce. Computing the loss at 35 cents per salmon, and with the possibility that fish purchased on the open market would have averaged smaller than those which respondent's gear was designed to catch, the loss might have run to $735.

There is another element also to be considered, and that is the testimony that fish running fifty or less to the tierce commanded the highest price, the smaller fish being worth less, making a possible difference at the most of $23 per tierce, or $690 for the thirty tierces, so that, if fish could have been had on the open market, if they had been the smallest described in any of the testimony, and had sold for the price of the smallest fish as testified to, the loss could have been only $1,425, which, of course, must have been reduced by the amount of the trade acceptance of $214.50; so that, manifestly, the reduction of the verdict to $3,133.02 did not meet this situation.

Since the judgment must be reversed for the reasons stated, and a new trial ordered, it is perhaps proper to say that, while the testimony of respondent as to market value was not of the most convincing character, yet we think it admissible and the overruling of appellant's motion to dismiss the cross-complaint at the close of defendant's case, upon grounds other than those here discussed, was not error, since there was sufficient evidence to take the other questions to the jury. It does not appear that appellant raised this

point by its motion, or that the motion was renewed at the close of all of the testimony. The other matters complained of are not likely to occur upon another trial and need not be considered.

The judgment appealed from is reversed, with directions to grant a new trial.

MAIN, C. J., PEMBERTON, BRIDGES, and PARKER, JJ., concur.